Wardlaw, J.,
dissenting.
So far as the views of the Court were expressed orally in consultation, it is understood to be the opinion of the majority that testator’s taking Amy and other slaves to Ohio, after expressing his intention to emancipate them, constituted emancipation of them. My brethren, I suppose, do not controvert that which was conceded in the argument of appellant’s opening counsel, that testator contemplated further acts than he performed, in consummation of his purpose of manumission, and never at any time entertained the opinion- or design that the emancipation of these slaves would, or should be complete by the act of landing them in Ohio. In his will, which is his only utterance after Amy and the other slaves *518 reached Ohio, albeit that utterance is by implication of law, he describes Amy and her children as his slaves, and directs his executors to bring them to Ohio, and to emancipate and set them free in said State. About the time the will was written, in a conversation with Andrew H. Ernst, one of his executors, Ernst testifies that testator asked him to be one of his executors, and that testator had not then fully determined in his own mind what course to take to accomplish his end. In March or April, 1855, he said to John H. Howard, “that as he could not do so in this State, he had determined to take them to Ohio, and free them there; that he had been to Ohio, and had made arrangements to take them to Cincinnati.” The reference is unequivocally to his'visit to Ohio at the time of the execution of his will, and to the arrangements prescribed therein. Without this, it is manifest that when he speaks of taking them to Ohio, and freeing them there, he contemplates something ulterior to taking them there. The connecting particle “ and” necessarily has this force. To the same effect is his declaration to William Cullum, while aboard the Strader, “he was going to Ohio to set them free and school the children ; he was going to buy them a farm.” Of like effect is his declaration to Reason Woolley, “ he was going to carry them to Ohio, to Cincinnati; he wanted to go and carry them and free them, so they could have the benefit of his property; he would come back in three weeks, if he had good luck, and when he came back he would carry Gilbert, (brother of Amy,) and free him.” Ary, wife of Season Woolley, is more unqualified in her testimony than any other witness, and her statement is, that testator told her “ his object for taking them off was to carry them where they would be free, and to provide for them.” It may be reasonably concluded, as Mr. Jolliffe states in his argumeut, that she referred'to the same conversations concerning which her husband testifies; but, however this may be, she means no more in fair construction of her words, than that testator said his object was to take the slaves to some sovereignty where they could be set free, be *519 suffered to reside, and enjoy the provision he intended to make for their maintenance, and it is only by torture of her phrases that she can be misunderstood to denote testator’s intention to manumit them by the naked act of carrying them within the jurisdiction of Ohio. It may be deduced from the testimony of this witness, and from the evidence as a whole, that the purpose of testator, in taking these slaves to Ohio, was merely part of a system of measures, to sell his property here, to remove with the proceeds to a free-negro State, to emancipate these slaves there, to buy a farm for them, and educate the children. It is unquestionable that he had for years a vague wish and intent to emancipate Amy and her children ; but. when he went to Ohio this intent was provisional and tentative, to be or not to be executed, as experience there might demonstrate its policy or its folly. From the nature of intent, it is revocable and inoperative until actually executed; the retraction of it and the retention of the right to retract, or locus penilentias, have the same consequences-The subsistence of the intention at the time some act is done, apparently in consummation of it, may be sometimes inferred from previous statements of the intention to effect the object; but such previous declarations are always mere evidence of the character of the act, and in any case may be disbelieved, and are never sufficient and satisfactory proof, where the act is equivocal, if the purpose be unlawful and impolitic, and contrary to the social and political duty of the actor. The legislature of this State, for the citizens thereof, enacted, in 1820, that no slave should be emancipated but by Act of the legislature. The beginning of the emancipation supposed in this case was illicit in its origin, certainly so continued so long as the master and slaves had not passed beyond the limits of the State, and the presumption, at least in a forum of this State, is against the completeness of emancipation in any foreign jurisdiction, until the fact be demonstrated by evidence.
The case of Fryer vs. Fryer, Rich. Eq. Ca., 92, illustrates *520 these views. Marriage, in this State, is a civil contract, needing no writing or other ceremony for its manifestation; indeed, needing nothing but the agreement of the parties, in good faith, to constitute the relation. A contract per verba de presentí, such as “we marry” or “we are man and wife,” is marriage, and a reciprocal contract per verba de futuro, such as “I promise to marry you,” copula sequente,\s also marriage; lb., no. In the case cited, the couple agreed to marry, and with that purpose went to a magistrate’s house to have the ceremony performed, but he being from home, they returned saying, falsely, they had been married, were put to bed as man and wife the same night, and cohabited for three years or more, in the course of which they frequently declared they had been married; still, this was pronounced no marriage, principally for the reasons that, at the magistrate’s house, the parties looked to a future celebration of nuptials, and did not themselves regard the copula as perfecting the agreement. Chancellor Johnston says, p. 97, “where there was no express stipulation that the copula should perfect the previous executory agreement, yet, if it be evident that the parties understood and intended that act to perfect it, I suppose it must have that effect. But it is of the essence of every contract that the parties shall have a present contracting intention, at the time of perfecting their contract; they must understand that they are making a contract; otherwise, no contract is made. I do not say that they must have a full understanding of the legal consequences of the contract they are forming. The contract once made, the consequences are matter of legal obligation, and they must abide them. But where such is the penalty, it is but reasonable the parties shall not be held to have made a contract, unless where they had knowledge that they were contracting and intended to contract.” Again, at p. 98, “where it is established that the parties came together unlawfully, their continuing together must be considered unlawful, until they show a subsequent marriage.” It will not be disputed that *521 emancipation is a contract, for, in its most general sense, the word contract signifies any engagement, obligation or compact, and this may be unilateral or inter partes. Broom Com. L., 257; 1 Pow., 6. Now, applying the Chancellor’s doctrine to this case, it is plain that Willis did not intend, by that act of going ashore at Cincinnati, to emancipate Amy, and did not know that he was thereby perfecting the emancipation. It was urged that this matter was settled by the maxim utile per inutile non vitiatur. The usual application of this maxim is to pleading, and it imports that mere sur-plusage, (where the redundant matter may be struck out without materially changing the general sense,) does not vitiate a count or plea. So, in the construction of deeds or other writings, by foice of the maxim, immaterial expressions may be rejected. Granting, however, that the maxim is of general application, and that the converse of it is equally true, namely, that the omission of immaterial words, or acts, intended to be expressed or done, does not impair the efficacy of an act already complete; how are we helped to a conclusion by the announcement of a proposition having no operation, except on assumption of the point in dispute? It is the precise issue of the case whether the act of Willis was complete, to be determined by concession in a South Carolina Court, as to property here, by the law of the State. It may be conceded that, in ordinary contracts, not inhibited nor restricted by any law of the State, mere ignorance of the law as to the necessary formalities, even if it consist in the belief that something superfluous is demanded by law, will not invalidate a contract actually fulfilling all legal requirements. Thus, a will attested by three witnesses, would be valid, although testator supposed four witnesses were required, and intended to procure a fourth. An illustration of this principle, suggested by counsel, seems to have been very effective with a portion of the Court. Suppose, it was said, a slave should be sold by one citizen of the State to another, and the price was paid, and the slave was delivered, and the parties *522 should ignorantly believe that a bill of sale was indispensable, and agree to meet the next morning to give and receive such bill of sale, but the death of one of them, or some other impediment, prevented the execution of it, would such ignorance or mistake invalidate a sale already complete? Certainly not; for, in such case, neither universal law nor local law required a bill of sale; but suppose, to make the case put analogous to that in hand, the local law did require a bill of sale, then payment of the price, and delivery of the chattel, would not make a sale, however Cimmerian may have been the ignorance of the parties.
Much learned argument was employed to enforce the uncontested proposition, that by the law of nations, in the absence of local prohibition, a master may manumit his slave by any act or declaration which manifests his purpose to extinguish or throw off his dominion. But a State may regulate, to any extent, the relation of master and slave, as to its ^existence and dissolution; for example, might inhibit the removal of a slave from the district in which he was born, or his manumission in any place. In South Carolina we have such local prohibition. The Act of 1820 declares that no slave shall be hereafter emancipated but by Act of the legislature, and the Act of 1841 declares null and void any gift of a slave, by any mode of conveyance, with a view to emancipation, and any devise or bequest to a slave, wherever he may be, or more exactly according to book, without any limitation as to the existence of the slave within the State. There may be some misapprehension or confusion as to the extra territorial vigor of general laws of a State ; but the fulness of occupation of my time does not permit me now to discuss this topic extensively. Briefly and generally, my opinion is, that a State, by its legislation, may control the contracts and acts of its citizens, wherever they may be, so long as they acknowledge their allegiance; although in just construction, general provisions, where there is no express extension, should not be held to include foreign *523 acts. According to the common law of England, and, as English text-writers say, according to universal law, no native subject or citizen of one sovereign, without the concurrence of such sovereign, can divest himself of his natural, primitive, and intrinsic allegiance, by any act of his own — even by swearing allegiance to another sovereign. Broom’s Leg. Max., 33. Denial of the right of expatriation does not include denial of the right to change one’s domicil; but no respectable publicist has ever maintained that a slave could have domicil, at least a separate domicil from his master’s. It is enough for present purposes to adopt the opinion of Judge Story, no extravagant friend of the rights of the separate States of the Union, as expressed in Van Reimsdyck vs. Kane, Gallison, 377: “ Every State has, within its own sovereignty, an authority to bind its citizens everywhere, so long as they continue their allegiance. Unless, therefore, it be restrained by constitutional prohibitions, it may act upon the contracts made between its own citizens in every country, and, consequently, may discharge them by general laws. But such is not the operation of jurisdiction on contracts made by a citizen with a foreigner, in a foreign country. If, in such case, the legislature, by positive laws, nullify such contracts, it is certain they cannot be enforced within its own tribunals, but elsewhere they remain with the original validity, which they had by the lex loci contractus. But if a statute be general, without a direct application to foreign contracts, the rule approved by Casaregis, seems proper to be adopted, that its construction shall not be extended to such contracts. Ratio est quia statutum inteli-git semper disponere de contractibus factis inira et non extra territorium suum.” Now, certainly, Willis, at his death, was a citizen of South Carolina, and Amy no foreigner, and as the State, having nullified for its citizens the right of a master to emancipate a slave, her tribunals must enforce the inhibition as to property within her limits. It may be that, in our condition as a Confederate State, we can send no force *524 to Ohio to capture Amy, nor if Willis were living, and abided beyond the limits of the State, could we send any force to bring him within the jurisdiction ; but when the person or the subject, a representative of Willis or his property, becomes amenable to our jurisdiction, we must enforce South Carolina law and policy. It would hardly be contended that a citizen of this State could give an estate to a slave in Georgia.
If the law of Ohio, a State so oblivious of the comity due to her confederates, could control this controversy, the result of this litigation would still be doubtful. It is true that her Constitution excludes involuntary servitude, except for crime, without any saving as to travellers, sojourners, or fugitive slaves. But in some of her statutes, as to slaves, conscientious professions are made. Thus it may be mentioned, as a matter more curious, than relevant, in the preamble of a statute relating to fugitives from labor or service from other States, passed in IS39, the second section of the fourth article of the Federal Constitution is incorporated, and it is set forth: whereas, it is the duty of those who reap the largest measure of benefits conferred by the Constitution, to recognize to their full extent the obligations which that instrument imposes; and whereas, it is the deliberate conviction of this General Assembly that the Constitution can only be sustained, as it was framed, by a spirit of just compromise, therefore it is enacted, among other things, that all officers proceeding under the Act, shall recognize, without proof, the existence of slavery in the States of the Union in which it exists. Stat. of Ohio, 595, 599. By an Act passed in 1804, it is enacted that after June 1, then next, no black or mulatto person shall he permitted to settle or reside in Ohio, unless he or she shall first produce a fair certificate from some Court within the United States, of his or her actual freedom, and that such persons there residing shall register themselves, &c. Stat. Ohio, 592. And by an Act in 1807, lb., 593, no negro or mulatto shall be permitted to emigrate into and settle within the State without giving bond, &c. No special con *525 struction of these statutes will be attempted, but it may be pertinently asked, how could Amy, forbidden to emigrate to Ohio and settle there, acquire domicil and freedom by unlawfully going thither? We may understand from the provisions of these statutes, how Willis, under advice, supposed he must do something towards the emancipation of Amy after he reached Ohio, and why the executor executed the deeds of emancipation.
It is plain that some of the views thus presented hurriedly, are contrary to the opinions announced in Frazier vs. Frazier. The proprieties of my position prevent me from the full expression of my aversion to the doctrines of that case; but I may say, respectfully, that it cannot be regarded as a case of high authority. It overruled the case of Bynum vs. Bostick, 4 De S., 266, which,for many years, had prevailed as the law of the State. It was decided by two Judges, very eminent men, entitled to the esteem and regard of all our people, and always receiving my own, against'two Judges, one of whom is the father of Equity in South Carolina, and the other a Judge unequalled with us in genius, juridical learning, and extent of reputation as a jurist. It was followed in ihe same year by the disorganization of the Court which pronounced it, and, as many believe, served, to some extent, to produce this disorganization. Its prominent result was explicitly annulled, as a general consequeuce in similar cases, by the Act of 1841. It has never been directly approved in any subsequent judgment which is reported. We have been referred to the cases of Finley vs. Hunter, 2 Strob., 214, and Gordon vs. Blackman, 2 Strob., 45, 1 Rich., 64, as compurga-tors of its doctrines. In the former of these, Chancellor Johnston said, in the circuit decree: I am bound by Frazier vs. Frazier, however much I doubt its correctness, and in the appeal decree, it is said that the object of the Act of 1841 was to defeat every effort to evade the Act of 1S20. In the latter case, the Chancellor on circuit said : Frazier vs. Frazier covers the whole ground. I am hedged in on all *526 sides, and must submit here, that is, on circuit, and clearly-implying dissatisfaction; and the Court of Appeals mentioned the doctrine of the case as a historical fact, and without approval, saying the Court decided in Frazier vs. Frazier, it would not interfere to prevent the execution of such a trust, while there was no law to forbid it; and then proceeded to give retrospective effect to the Act of 1841. In this very case, on the issue of probate, 10 Rich., 186, Judge Withers, organ of the Court, puts the matter adjudged in Frazier vs. Frazier, conditionally, “if it be law,” &c. On the whole, in reference to Willis, I must adopt the language of one of the characters of Shakspeare, and his legal acquirements have been elaborately vindicated by the Lord Chancellor of Great Britain, lately Chief Justice of the King’s Bench :
“ His act did not overtake his bad intent,
And must be buried but as an intent
That perished by the way; thoughts are no subjects,
Intents but merely thoughts.”
My brethren seem more inclined to adopt the extravagance of the Irish orator, which revolts most men of sober mind and correct taste, and to declare as the law of South Carolina: “The first moment a slave touches the sacred, soil of Britain (or Ohio) the altar and the god sink together in the dust; his soul walks abroad in her own majesty; his body swells beyond the measure of his chains that burst from around him; and he stands redeemed, regenerated, and dis-enthralled by the irresistible genius of universal emancipation.”

Decree reversed.